IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| BARRY L. BUCHANAN | ) | |
| MELISSA A. BUCHANAN | ) | |
| | ) | CASE NO. 05-75606 |
| DEBTORS. | ) | |

**MEMORANDUM DECISION**

      The matter before the Court is the United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) filed January 30, 2006 in which the United States Trustee alleges that the Debtors, Barry and Melissa Buchanan, have available disposable income to make a substantial repayment of their unsecured debt over the course of a thirty-six month chapter 13 plan and that their bankruptcy filing constitutes a "substantial abuse" of the provisions of Chapter 7 of the Bankruptcy Code.  This Chapter 7 case was filed on October 15, 2005; therefore this case is controlled by the law in effect prior to the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).  This matter was set for trial and heard on July 18, 2006.  The matter has been fully briefed by the parties and is now ready for decision.  For the reasons stated below, the Court will grant the United States Trustee's Motion.

DISCUSSION OF PROCEEDINGS AND EVIDENCE

      Federal Rule of Bankruptcy Procedure 1017(e)(1) requires the United States Trustee with regard to a motion to dismiss for alleged substantial abuse to "set forth in the motion all matters to be submitted to the court for its consideration at the hearing."  The matters

relied upon by the United States Trustee may be summarized as follows: The Debtors' Schedule

J includes expenses which are excessive for a family of four, specifically auto insurance

($405.00) and a payment on a Harley Davidson motorcycle ($411.00). It is claimed that

reducing these expenses to amounts which are reasonable and necessary gives the Debtors

disposable monthly income over "$600 which would enable them to fund a chapter 13 plan to

pay over 80% of their scheduled and allowed unsecured debt in thirty-six months." (Mot.

Dismiss 4.) The Debtors' bankruptcy filing was not precipitated by sudden illness, calamity,

disability or unemployment, but results from overspending over time and the refusal to adjust

cost of living expenditures to reflect the obligation to repay creditors. The United States Trustee

relies on the fact that on June 19, 2005, the Debtor purchased a new Harley Davidson motorcycle

for $26,770 incurring a secured debt of $25,332. The Debtors are asserted to have lived beyond

their means as evidenced by the accrual of the secured debt on the motorcycle and $19,758 on

fourteen credit cards and consumer accounts. The expenditures associated with the new

motorcycle and  insurance are asserted to be unreasonable and unnecessary given their financial

circumstances at the time of filing.

       The Debtors signed the petition and schedules on October 6, 2005. The case was

filed on October 15, 2005. The Debtors are married and have two scheduled dependents ages 9

and 16. The Debtors live in a three bedroom, one bathroom home with five people. Mr.

Buchanan testified that his brother's daughter also lives with them.[1] Mr. Buchanan testified that

he has been employed by Virginia Gas Company, now Duke Energy, for over nine years. He

---

[1] The Debtors gained custody of their niece on December 19, 2005, after filing the petition. Mr. Buchanan testified that they have incurred greater expenses with regard to this child, however no amendments to their schedules have been filed.

reported income of $71,741.00 in 2003, $63,509.00 in 2004 and $39,962.97 as of August 7, 2005.  The Debtors owned and operated a video rental store, Buchanan's Video Vision (hereafter referred to as the "business"), beginning January 1, 2002.  The Debtors placed a second mortgage on their home in the amount of $20,000 to obtain the start-up cash for the business.  Mrs. Buchanan was an employee of the business and was not drawing a regular paycheck due to lack of profits.  The Debtors testified that the business was never successful.  The business, due to lack of profits, closed on September 4, 2004 and was dissolved on December 31, 2004.  In July 2005, Mrs. Buchanan began working at SI Industries earning $9.00 an hour.  She reported income of $2,448.00 from her employment as of September 9, 2005.

On Schedule I the Debtors represented that Mr. Buchanan had gross monthly income of $5,700.22, which after payroll deductions of $1,799.89 left a net disposable income of $3,900.33 per month.  The Debtors reported that Mrs. Buchanan had a gross monthly income of $1,404.00, which after payroll deductions of $410.95 left a net disposable income of $993.05.  Against a combined monthly income of $4,893.37, the Debtors reported monthly living expenses of $4,815.28, leaving a monthly surplus of $78.10.  The itemization of the monthly expenses as reported on Schedule J is as follows:

| | |
|---|---|
| Mortgage Payment | $565.28 |
| Electricity and Heating Fuel | $160.00 |
| Water and Sewer | $68.00 |
| Telephone | $79.00 |
| Cable Television/Internet Service | $125.75 |
| Cell Phone | $100.00 |
| Home Maintenance (repairs and upkeep) | $125.00 |
| Food | $500.00 |
| Clothing | $125.00 |
| Laundry and Dry Cleaning | $20.00 |
| Medical and Dental Expenses | $80.00 |

| | |
|---|---|
| Transportation (not including car payments) | $310.00 |
| Recreation | $80.00 |
| Charitable Contributions | $100.00 |
| Homeowner's Insurance | $34.00 |
| Auto Insurance | $405.00 |
| Real and Personal Property Taxes | $28.05 |
| American General/Furniture Payment | $98.25 |
| Harley Davidson Motorcycle Payment | $410.79 |
| Suntrust/Ford F150 Auto Payment | $407.30 |
| US Bank/Toyota 4 Runner Auto Payment | $426.86 |
| Wachovia/Second Mortgage Payment | $100.00 |
| Cleaning/Laundry Supplies | $45.00 |
| Gas for Fireplace Logs | $50.00 |
| Personal Care Products/Personal Grooming | $100.00 |
| Pool Maintenance/chemicals | $30.00 |
| School Meals/Supplies/Sports/Clubs | $230.00 |
| Tanning Bed Maintenance | $12.00 |
| **Total Expenses** | **$4,815.28** |

According to their schedules, the Debtors own real estate valued at $65,600.00 as tenants by the entirety, subject to two mortgages totaling $71,147.36. The Debtors reported personal property totaling $86,118.85, $29,641.44 of which was claimed as exempt. The remaining $56,477.41 is comprised of a Wachovia checking account valued at $12.41, uncollectible late fees of approximately $20,000 - $25,000 from the business valued at $0, a leather sofa and entertainment center valued at $2,000, a 2003 Toyota 4 Runner, and a 2005 Harley Davidson motorcycle. Notably, the Debtors personal property also includes a 54" big screen tv (purchased in 1999 with cash), John Deere riding mower (purchased in 1999 or 2000)[2], above ground pool (installed in 1999) and a tanning bed. The Debtors' business had two tanning beds, one of which broke and had to be replaced as customers had booked tanning sessions

_____

[2] Mr. Buchanan testified that he uses the riding mower to maintain his property, which is three-quarters of an acre.

months in advance.  The tanning bed was purchased for the business and was financed with their

personal money from a tax refund.  Instead of liquidating the tanning bed with the business

assets when the business dissolved, the Debtors decided to keep it.

The Debtors reported secured debt totaling $144,647.66 on Schedule D,

comprised of American General Finance's claim of $2,922.94 secured by the leather sofa and

entertainment center valued at $2,000.00; Harley Davidson Credit's claim of $24,780.77 secured

by the 2005 Harley Davidson valued at $20,000.00; Suntrust NBC Bank's claim of $17,906.41

secured by the Ford F150 valued at $13,775.00; US Bank's claim of $27,890.18 secured by the

Toyota 4 Runner valued at $20,690.00; a first mortgage to Wachovia Bank of $65,153.12 and a

second mortgage to Wachovia Bank of $7,994.24.  The Debtors filed a Statement of Intention in

which they indicated their plan to assume the lease on the Toyota 4 Runner with US Bank and

the Verizon Wireless cellular telephone contract.  The debts to American General Finance,

Harley Davidson Credit, Suntrust NBC, US Bank, and Wachovia Bank are also listed, but the

Debtors' intention regarding these debts is not stated.  The Debtors reported general unsecured

claims totaling $19,758.32, comprised of four medical bills totaling $978.66, seven credit cards

accounts with a combined total balance of $17,354.90, two loans in the aggregate amount of

$1,424.76[3] and one Alltel cellular telephone contract with an unknown balance.[4]  The credit card

debt constitutes 87.8% of their general unsecured obligations.

---

[3] This actually appears to be a duplication.  Schedule F reports two debts originating on
April 18, 2005 in the amount of $712.38 each, one to American General Finance, reported as
unsecured loan, and the other to Colony House Furniture, reported as unsecured account.  The
basis for these debts was not explained or explored at trial.

[4] Schedule G filed by the Debtors indicates that the Debtors reject this contract, which
ends in November 2005.

The Debtors reported income from federal and state income tax refunds of $1,447.00 for 2003 and $5,476.04 for 2004 on their Statement of Financial Affairs. The 2004 figure is consistent with the aggregate total reflected in their 2004 year tax returns introduced into evidence as Exhibit # 4, but their 2003 year tax returns introduced as Exhibit # 3 report aggregate tax refunds for that tax year in the amount of $6,717 versus the $1,447 reported in the Statement of Financial Affairs. The tax returns also report business losses for their video business in the amounts of $7,324.77 and $3,953.67 for 2003 and 2004, respectively. The Statement of Financial Affairs also lists a payment by the Debtors of $500.00 plus $300.00 costs and filing fee to Jessee, Read & Ely, P.C. for services related to debt counseling or bankruptcy on October 3, 2004. Mr. Buchanan testified that this was an error and that this actually was paid in October of 2005.

In addition to the 54" big screen tv, gas fireplace, above ground pool and tanning bed, the Debtors also own two automobiles and a motorcycle. The Debtors leased a new 2003 Toyota 4 Runner on April 19, 2003. Mr. Buchanan testified that he knew the financial condition of their business "wasn't really very good" in April of 2003, but they leased the Toyota 4 Runner because their 1999 Dodge Durango "tore up" after paying $1,500 to repair the transmission and having several different mechanics work on it. The Debtors wanted to replace the Durango with an "equivalent vehicle" and did not really consider leasing a less expensive vehicle. (Trial Tr. 14-15.) Mrs. Buchanan testified that they needed a larger vehicle as they needed a vehicle big enough for two children and Mrs. Buchanan's mother who is often with them. On July 12, 2003, the Debtors traded in a 2002 Ford Mustang, which was not fully paid for, and purchased a new 2003 Ford F150 pickup truck. Mr. Buchanan testified that one reason they traded in the

-6-

Mustang was that they did not think it would be appropriate for a sixteen year old to be driving a sports car.  Again, Mr. Buchanan testified that at the time of this purchase the business "wasn't doing great."  (Trial Tr. 16.)  In July 2004, Mr. Buchanan purchased a 2004 Harley Davidson Sportster motorcycle, again at a time when the business "wasn't doing great" financially. (Trial Tr. 18.)  Mr. Buchanan admitted that the business had not been successful, that they were not getting any income from it and were paying $500 a month on the start-up loan for business, but he still bought the new motorcycle.  Mr. Buchanan testified that he bought this motorcycle because they wanted another vehicle in anticipation of their son starting to drive.  He acknowledged that at the time he bought the motorcycle his son was not driving yet and that he did not need the motorcycle at that time.  Mr. Buchanan testified that he has a vehicle provided by his employer that he can drive for work purposes only.

In April 2005, the Debtors purchased a new leather sofa for $1,100 and an entertainment center for $600.[5]  The debtors had a cloth couch which was ten to twelve years old and torn which they wanted to replace.  Mrs. Buchanan was embarrassed for her son to bring people over to their home as the couch was so worn out.  The Debtors wanted a leather couch because they thought it would last and that they would not have to buy another one for a long time.  Mrs. Buchanan testified that they bought this second set of furniture on a 12 months same

---

[5] American General filed a Proof of Claim in this case for a secured claim of $2,067.22 on furniture valued at $2,298.  The Retail Installment Sales Contract attached to the Proof of Claim shows that the Debtors actually purchased the leather sofa for $1,599 and the entertainment center for $699.  Adding sales tax of $114.90, the total amount of the purchase was $2,412.90.

as cash plan and intended to pay it off with their 2005 tax refund.[6]

On June 19, 2005, Mr. Buchanan traded in his 2004 Harley Davidson and purchased a new 2005 Harley Davidson Road King motorcycle for $26,770.38, incurring a secured debt of $25,332.16 to be paid over 84 installments of $410.79 each, which resulted in a $12,000 increase in their debt.  (U.S.T.E. Exhibit 5.)  The sales agreement states that the Debtors paid $1,761.36 down and traded in the 2004 Harley Davidson.  However, Mr. Buchanan testified that he did recall paying any money down.  In response to questioning by the Court, Mr. Buchanan testified that he purchased the new motorcycle because he wanted an upgrade in the motorcycle that he had, explaining that the Road King is a little bit bigger and more stable as the smaller motorcycle didn't fit his frame as well.  Mr. Buchanan testified that he did not consider this Harley motorcycle a luxury item.  He thought at the time that they had the financial means to pay this debt because his wife had recently found work and they assumed they could afford the vehicles they had.

The Debtors testified that they are current on the payments on their mortgages, the Harley Davidson, Toyota 4 Runner, Ford F150 and insurance for vehicles and motorcycle.  Mrs. Buchanan testified that they had two major credit cards that they used for the business, Discover and CitiBank.  They ended up with five different credit cards[7] because she tried to

---

[6] The Court inquired of Mrs. Buchanan about the purchase of the furniture on credit in April, 2005 in view of their reported $5,476 in tax refunds from their 2004 year tax returns.  Her testimony concerning the use of the refunds is as follows: "[W]e saved it.  We put it up and used it when we needed it for emergencies or the video store. And we had some money saved when we purchased the video store and we went through all of our savings, trying to keep the video store going." (Trial Tr. 86.)  She also testified that although the business closed in September 2004, they continued to pay business taxes.

[7] Schedule F reports seven credit cards, but one of them is for "Sams Club" and another is for "Sears".

transfer the balances over to other credit cards with lower interest rates.  While the Debtors

testified that most of their credit card debt is related to the failed business, they admitted that

they continued to make personal purchases on these credit cards through the summer of 2005,

including a two-day family vacation to Dollywood and Pigeon Forge ($800)[8], pool supplies

($285.19) and various items from Blackwell Harley Davidson ($529.20).  The specific purpose

or identity of any other credit card expenditure was not established.  Mr. Buchanan testified that

at the time they incurred this debt they had every intention of paying off their creditors.  No

evidence was offered of any cash advances obtained by use of any credit card.

      The parties testified that their oldest son, Joshua, currently drives the Ford F150

and drives himself and their younger child, Austin, to school.  With their work schedules, Mr.

Buchanan testified that they are unable to take the children to and from school, extra-curricular

activities and sports.  Joshua has a job doing lawn maintenance.  Mr. Buchanan testified that the

only vehicle available to him when he gets home from work is the motorcycle, which he uses

before his wife and his older son come home.  He uses the motorcycle to get to and from

activities such as youth group at church and baseball and basketball games for which he is a

referee.

      According to Schedule J filed with their petition, the Debtors pay $405.00 per

month for auto insurance.  At the time of filing, however, the Debtors paid a yearly premium of

$2,155.76 for their vehicles ($179.65/month) and $567.00 for the motorcycle ($47.25/month), a

total of $226.90 per month. (Brief in Opp'n. para. 16.)  When the petition was filed, the Debtors

---

[8] Mrs. Buchanan was to start her new job the day after their vacation ended.

were anticipating that their son would be added to their insurance policy within six months and

their yearly premium increasing to $4,520.00 ($376.67/month) for their vehicles (not including

the motorcycle). (Brief in Opp'n. para. 17.)  The Debtors estimated their monthly insurance

payment on Schedule J to be $405.00.  However, Mrs. Buchanan testified that they previously

paid $88 a month for car insurance and that they currently pay $323 a month for car insurance

which includes their son.  (Trial Tr. 84.).  According to an Amended Auto Policy Declarations

and the renewal bill for the motorcycle, the Debtors currently pay a yearly premium of $3,425.64

($285.47/month) for their vehicles and $463.00 ($38.58/month) for the motorcycle, a total of

$324.05 per month.  (U.S.T.E. Exhibit 9).

      Mrs. Buchanan testified that she handled the budget and paid the bills in their

household.  According to their testimony, the Debtors first considered filing bankruptcy for their

business in August or September 2004 prior to the business closing, but after Mr. Buchanan

talked with his employer's attorney, they decided not to file at that time.  In their response to the

motion to dismiss, the Debtors' counsel stated: "They held on for many months of 2004 and

2005, trying to repay their debt before acknowledging that they could not handle their debts with

their new income and expense situation." (Brief in Opp'n. para. 7.)  Mr. Buchanan admitted that

counsel for the Debtors included that statement based on information provided to him by the

Debtors.  Mrs. Buchanan testified that she realized that their expenses were exceeding their

income and that they didn't have enough money to buy groceries in September 2005 and they

decided to file for bankruptcy at that time.  In response to a question by the Court, Mrs.

Buchanan admitted that their financial situation was similar in April 2005 to that in September

and that during 2004 and 2005 before she obtained employment with SI Industries they were

going "in the hole" every month.  (Trial Tr. 85.)  Mrs. Buchanan admitted in response to

questions from the Court that when they made purchases they went "first class" and made "top

of the line" purchases (court's terms in each case).  (Trial Tr. 88.)  She testified that it bothered

her that they were not able to pay the debts they had already incurred and acknowledged that

some of the decisions they made were not the "soundest financial decisions." (Trial Tr. 89.)

After discussing the purchases made in 2005, the Court asked Mr. Buchanan to respond to this

assumption:  "[I]t looked like you were sort of loading up [on consumer debt] and going out in a

'blaze of glory' before you decided to file bankruptcy.  It just sort of gives a little bit of a whiff

of that."  (Trial Tr. 57.)  In response, Mr. Buchanan testified that he had been hoping that his

wife would find a job and that they could provide for the expenses that they had incurred.  Mr.

Buchanan testified that once his wife found this new job, "we sincerely thought that we could

pay the expenses that we had, regardless, not including the business debt, . . . that we had

incurred."  (Trial Tr. 58.)  They realized, however, that even with Mrs. Buchanan's income, they

were barely making it.  Mrs. Buchanan testified that they tried to reduce their monthly expenses,

but could not.  Mrs. Buchanan admitted that they did not consider turning in the Harley

Davidson despite their financial circumstances, that it was necessary for them to have three

vehicles.  She admitted that "possibly" their biggest problem was losing some money in the

video store and spending too much on the things they wanted to have. (Trial Tr. 89.)

       The United States Trustee urges that this case is one of substantial abuse because

he asserts that the Debtors have the ability to repay a substantial portion of their unsecured debt

in a thirty-six month Chapter 13 plan and that several of the Debtors' monthly expenses are

excessive and unreasonable.  Deborah Charles, a paralegal specialist employed by the Office of

the United States Trustee, testified at the trial that she had reviewed the schedules filed in this case and flagged this case for further inquiry after considering the following:  Mr. Buchanan's monthly income was high for their area; Mrs. Buchanan's additional monthly income; $1,200 monthly expense for vehicles; $405 monthly expense for insurance; tax refunds received by the Debtors in 2003 and 2004; and over $19,000 in unsecured debt.  Ms. Charles testified that she didn't see people earning $7,100 gross a month very often in the Debtors' area.  The United States Trustee estimates that the proper amount for auto insurance is $200.00 per month and questions the 2005 Harley Davidson payment of $410.79.  Ms. Charles admitted that the $205 figure that she reduced the insurance payment by was an estimate on her part, that it could have been calculated by taking Joshua off of the insurance completely as a driver.  Ms. Charles testified that she requested documents from the Debtors after reviewing their schedules and that the Debtors complied with every request.  According to the United States Trustee, reducing the Debtors' expenses to $200 for auto insurance and $0 for the motorcycle gives the Debtors $693.88 to fund a chapter 13 plan.  (U.S.T.E. Exhibit 8.)  Ms. Charles testified that even anticipating a deficiency of $6,000 if the Harley Davidson was surrendered and allowing for chapter 13 administrative expense claims, this would result in an 87.28% payout to unsecured creditors in a chapter 13 plan.

        The Debtors take the position that there is no substantial abuse.  The Debtors owned and operated a business which failed to net any profits or produce regular income for female Debtor, which they claim to be a calamity.  They contend that they were not on a spending spree or trying to acquire property at the expense of their creditors.  The Debtors purchased the new 2005 motorcycle after trading in a previously owned motorcycle.  At the time

-12-

of the trade-in, the debtors owed approximately $13,354.75 on the 2004 motorcycle and their

monthly payment was $263.28.  The difference in the monthly payments in the 2004 motorcycle

and the new 2005 motorcycle is $147.51.  The Debtors assert that if they surrender the 2005

motorcycle, it will create a substantial deficiency, thereby reducing the recovery for all the

unsecured creditors. (Brief in Opp'n. para. 31.)  Based upon Mrs. Buchanan's anticipated income

from her new employment, the Debtors believed at the time of this purchase that there would be

sufficient funds to pay for the new motorcycle and their other debts.

       In his post-trial arguments to the Court in support of the Motion to Dismiss, the

United States Trustee makes the following arguments with respect to the *Green* factors:


*Ability to pay:*

       The United States Trustee asserts that if the Debtors "demonstrate a modicum of

financial discipline, they have the ability to repay a significant portion of their unsecured debt

while continuing to enjoy an enviable lifestyle." (United States Trustee's Post Trial Mem. 9.)  If

the Debtors surrender the 2005 Harley Davidson, an unnecessary luxury, they will have an

additional $410.79 in disposable income.  Additionally, if the Debtors reduce their monthly

automobile insurance from $405 to $200, they will have $693.88 in total monthly disposable

income available to fund a chapter 13 plan.  The United States Trustee asserts that there was no

evidence offered as to the "need (rather than convenience)" for their son to operate a vehicle.

(United States Trustee's Post Trial Mem. 9.)  The Debtors take the position that based upon the

anticipated increase in income when Mrs. Buchanan learned that she was going to be employed

by SI Industries at $9.00 an hour, the Debtors believed that there would be sufficient funds to

finance the additional $147.51 per month associated with the trade-in of the old bike for the newer one.

*Sudden illness, calamity, disability or unemployment:*

The United States Trustee asserts that the Debtors' bankruptcy was not precipitated by sudden illness, calamity, disability or unemployment. On the other hand, the Debtors argue that the bankruptcy was precipitated by a calamity:  the fact that the Debtors' video rental business failed to net any profits or produce a regular income for Mrs. Buchanan.

*Incurred cash advances and made consumer purchases far in excess of ability to repay*:

The United States Trustee asserts that the Debtors have made consumer purchases far in excess of their ability to repay.  The Debtors have been "building and building" on their consumer debt for years.  (United States Trustee's Post Trial Mem. 10.)  During 2003, the Debtors claimed a loss of $7,235 from the operation of the business.  Despite this fact, the Debtors leased one new vehicle and purchased another with combined monthly payments of $834.  During 2004, the Debtors claimed a loss of $3,954 from the business.  However, on the eve of closing the business, Mr. Buchanan purchased a new 2004 Harley Davidson. According to the United States Trustee, the Debtors continued their spending pattern in 2005 purchasing a new couch, entertainment center and motorcycle.  The Debtors continued to incur unsecured debt through the Summer of 2005.  The Debtors assert that due to Mrs. Buchanan's anticipated increase in income with her employment at SI Industries, they sincerely believed that there would be sufficient funds to finance the additional $147.51 per month associated with the trade-

-14-

in of the old motorcycle for the new one.   Therefore, the purchase of the motorcycle does not

constitute a consumer purchase far in excess of their ability to repay.  (Mem. In Support of

Debtors' Denial of Substantial Abuse 2.)  There has been no claim of use of credit cards to

obtain cash advances.

*Excessive and unreasonable family budget:*

      The United States Trustee asserts that the Debtors' monthly expenses with respect

to two new vehicles, a swimming pool, tanning bed and new furniture are arguably

unreasonable[9], but the expenses associated with the motorcycle and monthly insurance payments

are definitely so.  The United States Trustee argues that if the Debtors surrendered the

motorcycle and did not incur the unnecessary expense of insuring their 16 year old son and the

motorcycle, they are able to repay their creditors nearly in full.

*Accuracy of the Debtors' schedules:*

      The United States Trustee did not challenge the accuracy of the Debtors'

schedules in his initial motion, but reserved the right to do so should evidence of the same be

discovered.  The United States Trustee asserts in his post trial memorandum that "[w]ith the

exception of having over-stated their actual monthly automobile insurance expense as of the time

of filing," the Debtors' schedules appear to be accurate.  (United States Trustee's Post Trial

Mem. 12.)  While claiming that their schedules as filed were accurate, the Debtors have not

---

[9] Counsel for the United States Trustee stated at the hearing that she was not challenging
the expenses for personal care and grooming, school meals, tanning bed maintenance and pool
chemicals.

protested the United States Trustee's observation that the Debtors' actual vehicle insurance

expense at the time of filing was significantly less than the $405 per month figure claimed in

Schedule J.

*Bad faith:*

The United States Trustee did not aver bad faith in his initial motion, but reserved

the right to do so should evidence of the same be discovered.  In his post trial memorandum, the

United States Trustee asserts that "[r]easonable minds could conclude that the debtors' conduct

rises to the level of lacking good faith." (United States Trustee's Post Trial Mem. 12.)  The

Debtors dispute strongly any suggestion of bad faith on their part.

The Court makes the following FINDINGS OF FACT concerning the factors to

be considered by it in determining the claim of substantial abuse advanced in the United States

Trustee's Motion:

1. The Court finds those facts discussed above which are not indicated to be in dispute

between the parties or otherwise the subject of conflicting evidence.  The Court further finds,

and this is not disputed by the Debtors, that the majority of their indebtedness is consumer debt

within the meaning of 11 U.S.C. § 707(b).

2.  The Debtors' actual vehicle insurance expense at the time of signing their schedules

on October 6, 2005 was $226.90 per month rather than the $405 per month figure stated without

qualification or explanation in their Schedule  J.

-16-

3.  At the time of the purchase of the first Harley Davidson motorcycle in 2004, at a time when they admit their video rental business was not doing well, the Debtors did not need such vehicle for personal transportation purposes and such purchase constituted a luxury purchase which they could not then afford.

4.  At the time when they purchased the second Harley Davidson motorcycle in 2005, at a time when Mrs. Buchanan, who had been without employment since the closing of their video rental business in early September of 2004, had just obtained an offer of new employment to begin in July of 2005, such purchase constituted a luxury purchase which they could not afford and did not need for their reasonable transportation needs.  The Court further finds that while it is undoubtedly a nice convenience to the Debtors to have a separate vehicle for their teenage son to use, either a motorcycle or another substitute vehicle in addition to the truck and 4 Runner is not a necessary expenditure in light of the fact that Mr. Buchanan's transportation to-and-from work is provided for by the vehicle supplied by his employer.

5.  While the consumer purchases using debt in 2005 clearly demonstrate financial irresponsibility on the Debtors' part at a time when they were going "in the hole" every month, they were not incurred with any expectation or plan of not paying for them and the Debtors believed that with Mrs. Buchanan's new job they would be able to pay for such purchases.

6.  To the extent of the payment for the Harley Davidson motorcycle ($410.79 per month) and the requisite vehicle insurance therefore ($47.25 per month at the time of filing), the Debtors' budget disclosed in Schedule J, considering their already existing obligations, was

excessive and unreasonable.[10]  A surrender of such motorcycle and cancellation of such

insurance would reduce their actual current budgeted Schedule J expenses by $449.37 per

month.  Adding to this amount the difference between their current actual post-filing vehicle

insurance expense for the Ford and Toyota vehicles ($285.74 per month) and the $405 per month

figure reported in Schedule J (reduced by the $47.25 petition date motorcycle insurance amount),

a $72.01 per month additional net savings, would enable them to propose and complete a

Chapter 13 plan of at least $521.00 per month for the benefit of their unsecured creditors.

7.  In light of the Debtors' estimation of a $20,000 value of the Harley Davison vehicle at

the time of filing as against an indebtedness therefore of $24,780.77, indicating a deficit of

$4,780.77, the Court finds that the $6,000 estimate made by the United States Trustee's witness,

Ms. Charles, as an assumed deficiency claim, is a reasonable one and the same is adopted as a

finding of the Court.

8.  The Court believes that it is more likely than not, and therefore finds by a

preponderance of the evidence, that the debts reported to American General Finance and Colony

House Furniture in the amount of $712.38, both indicated to have been incurred on April 18,

2005, represent a duplicate reporting of the same debt, probably resulting from an assignment of

the account from the seller of the goods to the company providing the financing for their

purchase.

_____

[10] The Court also believes that expenditures of $125 per month for cable television and
internet service and $100 per month for cell phone service in addition to their indicated regular
monthly telephone charges of $79 per month are excessive and unreasonable in light of their
inability to pay their creditors, but does not base its decision upon such expenses in view of the
fact that they have not been challenged by the United States Trustee and the Court did not
question the Debtors about such expenses at trial.

9.  On the basis of the foregoing findings, the Court finds that the Debtors have the ability to complete a chapter 13 plan which would provide for the payment of their mortgage payments, Ford truck loan payments, Toyota 4 Runner lease payments, and furniture loan payments and a distribution of approximately 67% to their unsecured creditors.  [$19,758.32, plus $6,000 deficiency on Harley Davidson motorcycle, minus $712.38 duplicate claim = $25,045.94.  $521.00 x 36 = $18,756  - $1,875.60 (chapter 13 administrative expense factor) = $16,880.40.  $16,880.40/$25,045 = 67%.]

10.  The Debtors' bankruptcy filing was not occasioned by factors beyond their reasonable control, such as sudden illness, calamity, disability or unemployment.  While the failure of their video rental business was certainly a contributing factor to their downfall, it actually was not the principal cause of that result.  Their filing was rather the result principally of their living a lifestyle, complete with new rather than pre-owned motor vehicles, swimming pool, 54" big screen television and top of the line Harley Davidson motorcycle, at the very limits of or beyond what their income would permit, in short by overspending for consumer purchases and refusing to cut back when it became evident that they had exceeded the financial resources available to pay for them.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984.  A motion to dismiss for substantial abuse is a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(A).

-19-

A court may dismiss a Chapter 7 bankruptcy case upon a motion by the United States Trustee if the case is filed by a debtor with primarily consumer debts and granting relief would be a substantial abuse of Chapter 7 provisions. 11 U.S.C. § 707(b).  *Collier on Bankruptcy* points out that Congress was concerned with the abuse of consumer debt and that § 707(b) of the Code was adopted as "part of a package of consumer credit amendments" included in the Bankruptcy Amendments and Federal Judgeship Act of 1984.  6 *Collier on Bankruptcy* ¶ 707.LH[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).  Section 707(b) only applies to an individual debtor whose debts are "primarily consumer debts."  Rule 1017(e) of the Federal Rules of Bankruptcy Procedure, implementing this section, provides that the "United States [T]rustee shall set forth in the motion all matters to be submitted to the court for its consideration at the hearing." It is unmistakably clear that such motions are not to be readily granted and that the onus is upon the United States Trustee to prove that the case is abusive, both by the quoted language in Rule 1017(e) and also by the last sentence in § 707(b), granting a presumption in favor of the debtor.

The Bankruptcy Code does not attempt to define "substantial abuse" and courts have struggled to apply this provision given the plethora of factual situations presented by debtors.  In summary, Congress appears to have been concerned about persons who knowingly or recklessly live beyond their means, who live the good life using the resources of their creditors to do so and then choose to walk away from their debts even though they have the financial ability to pay them and although their income levels may have given them the access to

the credit markets which have made their liberal lifestyles possible.[11]

The Fourth Circuit Court of Appeals has adopted a "totality of the circumstances"

test in determining whether substantial abuse has occurred. *Green v. Staples (In re Green)*, 934

F.2d 568, 570 (4th Cir. 1991). In *Green*, the Court listed a number of factors to be considered:

> (1) Whether the bankruptcy petition was filed because of sudden illness,
> calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer
> purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or
> unreasonable;
> (4) Whether the debtor's schedules and statement of current income and
> expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

*Id.* at 572. The *Green* court further held that:

> Exploring these factors, as well as the relation of the debtor's future income
> to his future necessary expenses, allows the court to determine more
> accurately whether the particular debtor's case exemplifies the real concern
> behind Section 707(b): abuse of the bankruptcy process by a debtor seeking
> to take unfair advantage of his creditors.

*Id.* The Court in *Green* further pointed out that a vast majority of circuit courts have held that

the debtor's ability to repay is the primary factor to be considered. *Id.* District Judge Kiser of

---

[11] *Collier on Bankruptcy* points out that in enacting § 707(b),

> Congress rejected attempts by the consumer credit industry to permit
> creditors to move for dismissal of cases on the basis that the debtor had
> an ability to pay debts. It also rejected the idea that a case should be
> dismissed simply because a debtor could pay a "reasonable portion" of
> his or her debts (defined as 50%), as well as the use of a five year period
> to determine whether such portion could be paid. The resulting section
> 707(b) is thus more narrow than the provisions originally sought be the
> consumer credit industry and targeted only at debtors who can pay their
> debts without difficulty.

6 *Collier on Bankruptcy* ¶ 707.LH[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).

this District has recently analyzed *Green* in *In re Harrelson*, 323 B.R 176 (W.D. Va. 2005).  This

opinion offers a thorough recent analysis by a court to which an appeal from this Court lies

detailing how a motion pursuant to § 707(b) for alleged substantial abuse ought to be

determined.  This Court will undertake, therefore, to apply the methodology of that decision in

deciding the present Motion.

*Ability to repay*:

        In *Harrelson*, Judge Kiser emphasized that "the ability to repay, although not a

dispositive factor, is the primary factor in determining substantial abuse." *Id.* at 179 (citing *Shaw*

*v. U.S. Bankr. Adm'r*, 310 B.R. 538, 540 (M.D. N.C. 2004) and *In re Norris*, 225 B.R. 329, 331-

32 (Bankr. E.D. Va. 1998)).  Judge Kiser went on to note that *Green* requires courts to look at

the totality of the circumstances.

> A court may not dismiss debtors' ability to repay debts as an irrelevant
> factor.  On the contrary, it is the primary factor in determining substantial
> abuse. . . . Courts have held that a debtor's ability to repay weighed in favor
> of a substantial abuse finding when the debtors could only pay 29% and
> 47% of their unsecured debt over a period of three years.

*Id.* at 180 (citing *Shaw*, 310 B.R. at 540 and *Norris,* 225 B.R. at 332).  The *Green* opinion

expressly recognizes, however, that "solvency alone is not a sufficient basis for a finding that the

debtor has in fact substantially abused the provisions of Chapter 7." *Green,* 934 F.2d at 572.

This Court has made a finding of fact that the Debtors have the ability to propose a 36 month

chapter 13 plan which would provide for payment of approximately 67% of their general

unsecured debt. Accordingly, this factor weighs in favor of granting the Motion.

-22-

*Petition filed as a result of a sudden illness, calamity, disability or unemployment:*

The court in *Harrelson* held that this factor weighs in favor of dismissal when the filing is not due to some "unforeseen tragedy." *Harrelson*, 323 B.R. at 178 (citing *Norris*, 225 B.R. at 333). The Debtors allege that the precipitating causes of their bankruptcy were the failure of the business and Mrs. Buchanan's lack of income. This Court has recently addressed this issue in *In re Fenster*, No. 03-05002 (Bankr. W.D. Va. July 14, 2005)(unpublished).

> Not only does a business failure not qualify as an "unforeseen tragedy" of the nature contemplated in *Harrelson*, but also the Court has been unable to find any case law which would indicate that a business failure such as this should be considered a "calamity" for the purposes of a §707(b) analysis. . . . While some cases do refer to the "calamity" of a business failure, those cases deal with the business as the debtor and are not found in the § 707(b) context. This Court believes the *Green* court to have implied that a calamity would be defined as an outside, unforeseeable event or series of events having a disastrous effect on the debtor.

*Id.* slip op. at 27. Failure of a business is certainly a reasonable and common precipitating factor in the filing of a bankruptcy petition, but it cannot reasonably be said to constitute an "unforeseen tragedy." Indeed, unfortunately failure of a small business venture is more likely to occur than its success. Accordingly, this factor weighs in favor of granting the Motion.

*Whether the Debtor incurred cash advances or made consumer purchases far in excess of his ability to pay*:

Case authority on this point varies widely. In *In re Vansickel*, 309 B.R 189, 211-12 (Bankr. E.D. Va. 2004), the court held that "relatively modest" debts including $28,000 in unsecured debt did not weigh in favor of dismissal, holding that due to the statutory presumption in favor of granting a debtor bankruptcy relief, the United States Trustee did not meet his burden

of proof in establishing substantial abuse.  In *In re Norris*, 225 B.R. at 333-34, however, the

court held that this factor did weigh in favor of dismissal when the debtors incurred more than

$90,000 of unsecured debt, lived in an expensive home, dined out, and utilized their 401(k) plans

to create a reserve fund for future expense.  Additionally, another district court held this factor

weighed in favor of dismissal when the debtors purchased a $4,000 bedroom suite, spent $1,000

a month for their daughter's college expenses, lived in a home they could not afford but were

unwilling to leave, and purchased two new cars.  *Shaw,* 310 B.R. at 540-41.

In this case there has been no claim of use of consumer credit to obtain cash

advances.  The United States Trustee contends strenuously that the Debtors did make consumer

purchases "far" in excess of their ability to pay; counsel for the Debtors contends just as

strenuously to the contrary.  While it is clear, assuming the validity of the Court's findings of

fact, that the Debtors did make consumer purchases which exceeded their ability to pay for them,

it is not so clear that their quantity and aggregate amount reached the difficult to define "far in

excess" level.  Based on the closeness of the evidence on this point, the Court regards this factor

as pretty much a tie and will not weigh this factor either in favor of or against the Motion.

*Excessive and unreasonable family budget:*

The Court has found that in light of their obligations to their creditors which the

Debtors had admittedly been struggling for two years or more to pay, their family budget at the

time of their bankruptcy filing, most notably in connection with the purchase and continued

ownership of the Harley Davidson motorcycle, was excessive and unreasonable.

*Accuracy of the Debtors' schedules:*

In his opinion in *Harrelson,* District Judge Kiser held that under the Fourth Circuit's decision in *Green,* inaccuracy of bankruptcy schedules is a factor, regardless of the Debtor's motive or intent to deceive, and therefore relevant. *In re Harrelson,* 323 B.R. at 179. The Court has found that Schedule J reported a vehicle insurance expense at the time of filing of $405 per month while their actual expense for such purpose at that time was $226.90 per month. This was a material difference of $178.10 per month (43.9 % of the $405 scheduled amount and 3.6 % of their total reported Schedule J expenses) and constitutes an inaccuracy in their scheduled expenses. While they contend that the $405 figure was intended to reflect the higher insurance expense which the addition of their teenage son to their policy would entail, such qualification was nowhere noted in Schedule J or elsewhere in their petition. The Court having found that such amount was materially and incorrectly stated, it concludes that it is justified in making the inference that such misstatement resulted from their desire to demonstrate that substantially all of their income was committed to their existing obligations and living expenses. Accordingly, this factor supports the granting of the Motion.

*Bad faith:*

District Judge Ellis of the Eastern District of Virginia in *McDow v. Smith*, 295 B.R. 69 (E.D. Va. 2003), a case involving a motion to dismiss for "cause" under 11 U.S.C. § 707(a), stated generally that "a debtor's 'bad faith' or 'lack of good faith' is evidenced by the debtor's *deliberate* acts or omissions that constitute a misuse or abuse of the provisions, purpose, or spirit of the Bankruptcy Code." *Id.* at 74 (emphasis added). Of particular significance on this

point would be a finding of wrongdoing on the part of the debtor, either in the accumulation of the debt or in the filing of the Chapter 7 petition. *Id.* at 82. Most cases resulting in a finding of bad faith involve egregious factual situations wherein the debtor has accumulated massive amounts of credit card debt with no intent to repay the debt, lives a lifestyle far above what he or she could afford and/or intends to avoid a large single debt. *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991); *see also In re Haddad*, 246 B.R. 27, 38 (Bankr. S.D. N.Y. 2000) (in addition to living an extravagant lifestyle, debtor was not candid in disclosure requirements and attempted to claim a wedding band as exempt while unmarried); *In re Ragan*, 171 B.R. 592, 596 (Bankr. N.D. Ohio 1994) (case dismissed under 707(b) after debtor withdrew more than $160,000 from IRA and recklessly spent it all with little or no regard for obligations to creditors). While the Court believes that the Debtors have exhibited financial irresponsibility, it does not find bad faith on their part. Therefore, this factor weighs against granting the Motion.

*Other factors:*

The Court of Appeals's opinion in *Green* did not hold that the factors it enumerated were exclusive or exhaustive. It adopted a "totality of circumstances" test which called for consideration of factors "such as" the ones specifically listed. *Green,* 934 F.2d at 572; *see also Vansickel,* 309 B.R. at 169 n.9 (stating that the *Green* list is illustrative rather than exhaustive). The parties have not suggested other factors to be considered by the Court and it has not identified any in its own review of the facts presented.

DECISION

The Court has determined most of the *Green* factors weigh in favor of granting

the Motion, including the most important one of ability to propose a Chapter 13 plan which

would provide a distribution to their unsecured creditors of more than half of the debt owed to

them.  It has further determined that one of the factors, the incurring of consumer debt far in

excess of their ability to pay, is a tie and will not be weighed in the balance.  The only factor,

albeit an important one, definitely weighing in the Debtors' favor, is that of good faith.  The sum

total of these factors under the instruction of *Harrelson* outweighs under the circumstances

presented here the statutory presumption in favor of Chapter 7 relief provided in 11 U.S.C. §

707(b).  Accordingly, the Motion will be granted.

For the reasons stated, the Court by separate order will grant the United States

Trustee's Motion to Dismiss unless the Debtors within fifteen (15) days of the entry of the

Court's contemporaneous order carrying out this decision file a motion to convert their case to

one under Chapter 13 of the Bankruptcy Code.

This 25th day of August, 2006.

William F. Stone, Jr.
_____
UNITED STATES BANKRUPTCY JUDGE